UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FEDERAL TRADE COMMISSION,

Plaintiff,

v.

BRIDGE IT, INC., a corporation, also d/b/a Brigit,

Defendant.

**Case No. ____________**

**COMPLAINT FOR PERMANENT INJUNCTION, MONETARY JUDGMENT, AND OTHER RELIEF**

Plaintiff, the Federal Trade Commission ("FTC"), for its Complaint alleges:

1. The FTC brings this action under Sections 5(a), 13(b) and 19 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45(a), 53(b), 57b, and Section 5 of the Restore Online Shoppers' Confidence Act ("ROSCA"), 15 U.S.C. § 8404, which authorize the Plaintiff to seek, and the Court to order, permanent injunctive relief, monetary relief, and other relief for the acts or practices of Defendant Bridge It, Inc. ("Brigit") in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and in violation of Section 4 of ROSCA, 15 U.S.C. § 8403.

## SUMMARY OF CASE

2. Brigit operates a personal finance mobile application that promises consumers who live paycheck to paycheck short-term cash advances if they enroll in a $9.99/month membership plan. Brigit debits the $9.99 monthly membership fee directly from consumers' bank accounts and automatically renews the plan until consumers cancel. Brigit advertises that

paying members will have the option to receive cash advances of up to $250, that their membership includes "instant" delivery of these cash advances, and that Brigit does not charge late fees or interest on outstanding cash advances and allows consumers to cancel anytime. In reality, few consumers who pay the monthly membership fee are eligible to receive cash advances of up to $250, many are not eligible to receive cash advances at all, and those who wish to receive the immediate cash advances they were promised cannot without paying extra. Moreover, once consumers subscribe to a Brigit membership, Brigit makes it difficult for consumers to cancel and stop the monthly charges from being debited from their bank accounts. Brigit uses design tricks, sometimes referred to as "dark patterns," to make consumers navigate a confusing process that impedes cancellation and is designed to divert consumers from the process. Moreover, Brigit outright prohibits consumers with an outstanding advance from cancelling, and instead requires them to continue paying $9.99 per month while they attempt to pay down their balance.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345.

4. Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1), (b)(2), (c)(2), and (d), and 15 U.S.C. § 53(b).

## PARTIES

5. The FTC is an independent agency of the United States Government created by the FTC Act. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC

also enforces ROSCA, 15 U.S.C. §§ 8401 *et seq*., which prohibits certain methods of negative option marketing on the Internet.

6. Defendant Bridge It, Inc., also doing business as "Brigit," is a Delaware corporation with its principal place of business at 36 West 20th Street, Floor 11, New York, NY 10011. Brigit transacts or has transacted business in this District and throughout the United States.

## COMMERCE

7. At all times relevant to this Complaint, Defendant has maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## DEFENDANT'S BUSINESS ACTIVITIES

8. Brigit operates a personal finance mobile application ("app") over the Internet that can be downloaded through mobile app stores such as the Apple App Store and Google Play or via app store links on Brigit's website. Brigit advertises its app as a tool that provides alerts and offers short-term cash advances when a consumer's bank account balance is running low so consumers can avoid paying overdraft fees.

9. Brigit has two membership plans, free and "Plus." Brigit's free membership includes alerts for low account balances but does not include cash advances. Brigit's "Plus" membership costs $9.99/month and promises consumers access to cash advances. Brigit automatically renews the membership and charges consumers the $9.99 membership fee each month until the consumer takes affirmative steps to cancel.

## I. Brigit's Misrepresentations About Its Cash Advances

10. Brigit markets its app to consumers who are living paycheck to paycheck, through advertisements on social media, television, and YouTube, and on its website, www.hellobrigit.com. Brigit promises it will give consumers who enroll in its paid plan the option to take cash advances of up to $250 whenever they need them. Brigit claims it will deliver these cash advances to members "instantly," "quickly," "ASAP," "within seconds," "when you need it," and even "in case of emergency." Brigit has told consumers they can expect "[f]ree instant transfers" and promises "no hidden fees . . . or fine print," and "[n]o . . . processing fees." Brigit also promises consumers they will pay "no interest" and "no late fees" for cash advances, and that they "[j]ust repay it next time you get paid." Brigit reinforces these claims during the enrollment process, which consumers complete by downloading Brigit's smartphone app.

11. In reality, few consumers who have joined Brigit and paid its $9.99 monthly membership fee have received access to cash advance amounts anywhere close to the $250 Brigit promises, and many have not been able to get any cash advances at all. For consumers who can get cash advances, Brigit charges an additional, undisclosed $.99 fee for "express delivery" that consumers must pay before they can receive the funds "instantly," "quickly," "ASAP," or "within seconds" as promised—otherwise, consumers must wait up to three business days. And despite Brigit's assurances that consumers can cancel anytime and will not pay late fees or interest charges, once consumers have taken a cash advance, Brigit locks them into its $9.99 monthly fee by blocking cancellation and further cash advances until the advance is paid in full.

## a. Misrepresentations in Advertising and Marketing

### *i. Advertising on Social Media, YouTube, and Television*

12. Since at least 2019, Brigit has advertised extensively on social media platforms such as Facebook and Instagram. Its ads expressly and prominently tell consumers that by signing up for a Brigit membership and downloading the app, they will be able to receive cash advances of $250 on demand. Brigit also tells consumers repeatedly that funds will be available "instantly," and that Brigit charges "[n]o late fees" and "[n]o interest." Examples of these ads appear below:










13. Brigit's ads emphasize that consumers can choose the amount of the cash advance they want to receive up to $250. In numerous ads, Brigit includes an image of a smartphone with bold text at the top of the screen stating, "You're approved for $250." Below this text is the statement "Select the amount you need," followed by several buttons illustrating that the consumer is free to select an amount of his or her choice between $100 and $250. In other ads,

Brigit includes a graphic depicting three dollar figures, with the largest figure—$250—appearing to have been selected. Examples of these ads that ran on Facebook and Instagram appear below:










14. Brigit also emphasizes the immediacy with which consumers can obtain $250 cash advances. Brigit's ads include bold headlines telling consumers they can "Get $250 instantly," "Get Money Exactly When You Need It," and "Get up to $250 whenever you need it." These ads often feature a prominent image of a smartphone with bold text at the top of the screen stating, "$250 delivered," and bold text in the middle of the screen stating, "Delivered Today." Examples of these ads that ran on Facebook and Instagram appear below:







15. Brigit advertises that its cash advances are fast and reliable and that consumers can count on them for emergencies. Some ads claim that Brigit sends up to $250 for "bills and emergency expenses," above a graphic depicting a consumer looking at her smartphone, which displays the message header "New Deposit Pending," and text stating "Your $250 is now on the way. We've got you covered." Others include the header "GET $250 WHEN YOU NEED IT," above a graphic showing a glass case with cash inside, with the words, "break glass in case of emergency." Other ads include headline text stating, "[w]hether you need money for bills or emergencies, we've got you covered," above a graphic of a smartphone screen with bold text at the top stating, "$250 delivered," and in the middle of the screen stating "Delivered Today." Examples of ads making these claims that ran on Facebook and Instagram appear below:










16. Brigit has claimed that consumers will receive instant advances for free, without limitation. For example, Brigit has advised consumers that they will receive an unlimited number of "[f]ree instant transfers." Brigit has differentiated itself from competitors on this basis, telling consumers that "[t]he other guys" charge "$5.99 ea." for instant transfers. In these same ads, Brigit also touts that it will not charge consumers any fees for these advances, including by claiming that consumers will pay "no hidden fees," "no late fees," and "[n]o interest EVER," and that they will even receive "[f]ree repayment extensions." Examples of ads making these claims that ran on Facebook and Instagram appear below:







17. Brigit also runs video advertisements on television and online platforms such as YouTube. These ads feature actors portraying consumers stating, "with Brigit, I can get 50 to 250 dollars." Videos depict a user scrolling through a smartphone screen showing various available dollar amounts between $20 and $250 and selecting $250, followed by a close-up of the screen showing, in large bold text, "$250 on the way!" Ads also tell consumers to "download the Brigit app today and get $50 to $250 dollars instantly." The ads tell consumers Brigit's cash advances are for people who live "paycheck to paycheck," and stress that qualifying is easy, claiming it only takes between one and two minutes to sign up and requires "no credit check." They also emphasize that Brigit charges "no hidden fees" and "no interest" on outstanding advances. Like its social media ads, Brigit's video ads tout that consumers can count on its cash advances for emergencies. Actors portraying consumers claim that "Brigit sent me money when I had an emergency," and "in an emergency, with Brigit, I can get $50 to

$250." In each case, these claims are followed by an image of a smartphone screen displaying, in large bold text, "$250 delivered." Ads also state, "with Brigit, I can get 50 to 250 dollars just in time to pay my rent," and "I get cash advances whenever I need it, no problem." These claims are immediately followed by an image of a smartphone displaying respectively, in large bold text, the statements "Success! $250 on the way!" and "Instant Cash[.] You're approved for $250."

18. Despite these prominent claims, the advertisements include a fleeting, inconspicuous text noting that eligibility requirements apply, advance limits vary between $50 and $250, and consumers should visit Brigit's website for details. The text does not inform consumers that Brigit is unlikely to make available $250, may not make any funds available at all, and will charge an extra fee to deliver cash instantly.

*ii. Brigit's Website*

19. Brigit reinforces the deceptive claims in its advertisements on its website, www.hellobrigit.com.

20. On the landing page of Brigit's website, consumers first see a screen that invites them to "join 4 million+ members who get up to $250." The page touts that there is "[n]o credit check required," and signing up "only takes 2 minutes," further reinforcing that consumers need not worry about qualification and eligibility. The landing page also tells consumers they will pay "[n]o interest." To the right of these words is a large illustration of two smartphones, one of which shows a screen stating in bold text at the top "**$250 delivered**," and in the middle, "Delivered Today." The screen appears as follows:




21. By scrolling down from this initial screen on the landing page, consumers see a series of additional discrete screens that make further claims. The first of these additional screens tells consumers, in bold headline text, that Brigit will allow them to "**Get up to $250 quickly.**" After the headline, Brigit promises consumers "Just tap to get an advance within seconds." These claims are accompanied by a large illustration of a smartphone screen offering the consumer, in bold headline text, to "**Choose the amount** you'd like us to send." Below these words is a scrolling selection tool showing options to receive $250, $240, $220, or $210. The screen shows "**$240 recommended**" in bold green text. The page also repeats that Brigit charges "no interest" for advances.




22. Brigit's website includes additional claims that emphasize the absence of fees beyond the $9.99 monthly membership. For example, on one page, in bold, headline print, Brigit states that it offers "**Two simple plans. No hidden fees, 'tips,' or fine print.**" On another page, titled "Our Values," under the heading **"Transparency**," Brigit explains that "[w]hen it comes to finances, nobody likes surprises. With Brigit, there are no hidden costs, ever. Ever."

**b. Brigit Reinforces Its Misrepresentations During Enrollment**

23. Brigit's advertisements and marketing materials tell consumers they can enroll in Brigit and receive cash advances by downloading the Brigit app on their Apple or Android smartphone, or by visiting the company's website—which directs consumers to download the app. The material Brigit provides in the Apple App Store and in Google Play further repeats and reinforces its claims. Similarly, the app's enrollment screens reinforce Brigit's claims.

*i. Deceptive Claims in the Mobile App Stores*

24. Brigit's app store listings claim it offers immediate $250 cash advances with no late fees or interest, and no hidden fees or fine print. For example, in the Apple App Store, Brigit's initial app listing screen includes the headline, "Brigit: Get $250 Cash Advance" and a graphic showing a smartphone screen with the headline "Get up to $250." When consumers click the listing, they are taken to Brigit's App Store page, which includes a larger headline stating "Brigit: Get $250 Cash Advance" and below, a larger version of the graphic with a headline stating "Get up to $250" and a phone screen showing "$250 delivered" in bold text at the top, and "Delivered Today" in the middle. This page appears as follows:




25. Immediately below the graphic is a text description of the Brigit app, which begins, "Get up to $250 when you need it*." If consumers expand the section by selecting "more," they see a longer text description that includes one section beginning, "UP TO $250* WITH INSTANT CASH," followed by "Get cash fast and avoid expensive overdraft fees and charges with up to $250* when you need it." The description also touts "$0 origination fees, $0 processing fees." By scrolling further, consumers see a section titled "EASY SIGN UP, FAST ACCESS," that includes the claim "Two simple plans. No hidden fees, tips or fine print." At

the bottom of the description, Brigit includes the remark "*Subject to Brigit's approval and policies."

*ii. Deceptive Claims During Enrollment*

26. Brigit offers two membership plan levels: a free plan that does not provide cash advances, and "Brigit Plus," which costs $9.99 per month and allows consumers to obtain cash advances. Brigit requires consumers to first enroll in the free plan before they may enroll in Brigit Plus.

27. After consumers download and open the Brigit app on their smartphones, it ushers them through a series of enrollment screens that link the app to consumers' bank accounts, determine the size and timing of their paychecks, and complete the sign-up process.

28. Consumers first encounter three welcome screens that repeat and reinforce Brigit's misleading claims and lead to a final welcome screen with a button that allows them to "Sign up." The first screen tells consumers they can "Get up to $250 when you need it." The second says, "Get cash instantly," followed by "Get up to $250 when you need it. No interest. No credit check." The third says, "No interest, no credit check, and no hidden fees!" The screens appear as follows:




29. If consumers select the button to "Sign up," they find that they must first enroll in Brigit's free plan before they can enroll in Brigit Plus and receive cash advances. To enroll in the free plan, consumers must link their cell phones and bank accounts to the Brigit app, confirm their bank account balance, and report their paydays and paycheck amounts to Brigit.

30. After completing these steps, consumers are enrolled in the free plan and many see a message telling them, "Overdraft Likely," with a large green button stating "Get Instant Cash." Pressing the "Get Instant Cash" button takes consumers to a screen saying they can get a specific amount that will prevent a negative balance "within minutes with no interest." The screen includes prominent graphics accompanied by the messages "Free instant delivery" and "No late or extra fees." Examples of these screens appear below:







31. If a consumer clicks the button at the bottom that says "Get Instant Cash," Brigit displays a screen that states in bold, "Get Plus to unlock Instant Cash," followed by "Only $9.99/mo." At the bottom of the screen, consumers are given one option to proceed—"Subscribe to Plus." Consumers next see a screen providing information about the day of the month and amount they will be billed, and are offered one option to proceed, by selecting a large green button over a white background that says "Subscribe." Examples of these screens appear below:







32. During enrollment, Brigit sometimes mentions dollar amounts below $250. But nothing Brigit does before or during enrollment in the free plan informs consumers that despite Brigit's offer of cash advances up to $250, consumers who enroll in Brigit Plus are likely to receive substantially less than $250. Not until after consumers subscribe to Brigit Plus and agree to pay $9.99 a month does Brigit tell consumers they are "approved for" less than $250 and even then, many consumers do not see or understand the disclosure.

33. Many consumers report being surprised to learn that they are not eligible for the $250 cash advances Brigit promises. In fact, numerous consumer complaints show that many consumers do not realize even after signing up that they cannot obtain $250.

### c. Brigit Provides Less Than the Advertised Cash Advance and Charges Extra for "Immediate" Delivery

34. Despite Brigit's numerous prominent claims that it will provide cash advances of

up to $250, few consumers receive anything close to that amount, if they receive anything at all. In fact, only approximately 1% of Brigit Plus customers have received access to $250, and approximately 20% have been denied access to cash advances entirely.

35. Additionally, despite Brigit's promises that consumers can "Get $250 instantly" with "Free instant transfers" and "Free instant delivery," while paying "no hidden fees," "no . . . processing fees," and "no hidden costs, ever[,] Ever," Brigit began charging consumers a fee of $.99 per advance in June 2022 to get cash advances immediately; otherwise consumers had to wait up to three business days for cash advances to arrive. Even after Brigit started charging this fee, it continued to tell consumers they could "Get $250 instantly" with "instant transfers" and "instant delivery," while paying "no hidden fees," "no . . . processing fees," and "no hidden costs, ever[,] Ever." And contrary to Brigit's claim of "transparency," it does not disclose the amount of this fee anywhere in its advertising, marketing, or enrollment material, its website, or even its terms of service. It is disclosed only after a consumer actually requests a cash advance.

## II. Brigit Has Made It Difficult for Consumers to Cancel

36. Brigit has made it difficult for consumers to cancel their subscriptions by using design tricks, sometimes referred to as "dark patterns," requiring consumers to navigate through numerous confusing screens littered with impediments to cancellation. Brigit also does not allow members to cancel their paid monthly "Brigit Plus" subscription when they have an outstanding cash advance, even though Brigit tells consumers they can cancel anytime.

### a. Brigit Uses Dark Patterns to Deter Consumers from Cancelling Their Subscription

37. Brigit has not posted a customer service telephone number on either its website or its mobile app. Consumers who have tried to cancel their account by sending an email to

Brigit's customer support have typically been directed to log in to their account and manage their subscription rather than having their request processed by Brigit.

38. Consumers who tried to cancel their account by using Brigit's chatbot named "Jess" have similarly been directed to log in to their account to manage their subscription rather than have their request processed.

39. To try to cancel, a Plus member might navigate to "Account settings" in the mobile app and select "My subscription."







40. As shown above, the "My subscription" page has included illustrations showing the features of Brigit's "Free plan" and "Plus plan." The portion dedicated to the Plus plan has not provided any options for cancelling, pausing, or otherwise deactivating the Plus plan

membership. Instead, in the portion dedicated to the Free plan, Brigit has included a line that says “Switch to this plan.”

41. If a consumer were to click that text, until January 2022, Brigit did not allow them to downgrade to the Free plan using the mobile app. Instead, mobile app users were directed to leave the mobile app to visit Bridget’s website, where they had to login again and start the process anew in a web-based app.

42. On the web-based app, Brigit has made cancellation difficult. If a consumer were to navigate to a settings page and then their membership page within Brigit’s web-based app, Brigit has displayed “Switch to this plan” under the list of Free plan options, but has not included an option to cancel the Plus plan. If the consumer selected “Switch to this plan,” however, rather than switching the consumer to the Free plan, Brigit has presented the consumer with a screen asking if they would like to “pause [their] Plus membership instead,” as set forth below:




43. The first and most prominent option presented to the customer on this page has been to "Stay on Plus plan," which has appeared as a large, dark green button against a white background. Below this button has been the option to "Pause or switch plan." If the consumer selected "Pause or switch plan," however, rather than switching the consumer to the Free plan, Brigit has displayed a screen informing consumers that their "Plus membership will be paused."







44. If a consumer were to scroll to the bottom of that page, the first and most prominent option has been "Pause now," which has appeared as a large, dark green button against a white background. Below this button has been the option to "Switch to the Free plan."

45. If the consumer attempted to downgrade by selecting "Switch to the Free plan," however, they instead have been presented with a survey question asking for their reason for downgrading their Plus membership, offering five reasons that can be selected. Consumers have been required to select one of those five reasons before proceeding to the next screen.




46. After those reasons, Brigit has displayed another large green button, though the button has not allowed consumers to submit their response and continue switching to the free plan; instead, it has prompted them to reverse course with the statement, "I've changed my mind." Below this button has been the option to "Submit and switch to free."

47. If a consumer were to click the prominent green button, they would have remained enrolled. And if the consumer again attempted to continue downgrading by selecting "Submit and switch to Free," Brigit has not at that point downgraded their Plus membership. Instead, Brigit has offered the consumer their "next subscription" beginning the following month "for **FREE**." An example of this screen follows:




48. The screen has told the consumer that they "are one of the lucky few" to receive that option, even though Brigit has prompted every consumer who made it this far in the cancellation process with the same solicitation. The first and most prominent option presented has been for the consumer to "Claim my free month," which has appeared as a large, dark green button against a white background. Clicking that button meant Brigit would not have charged the consumer for the next month—but then would have kept them enrolled in the $9.99/month Plus plan after that. Below the dark green button has been the option to "Switch to the Free plan." If a consumer persisted and selected "Switch to the Free plan" on this page, then and only then have they been finally unenrolled from the Plus membership.

49. Brigit has intentionally adopted many of these dark patterns to make it more

difficult for consumers to cancel recurring charges. For example, Brigit has removed consumers' ability to cancel a membership within the mobile app to "[i]ncrease friction to delete;" has added a requirement for consumers to complete a survey before downgrading as part of a plan to "reduce user churn" by "[a]dding [f]riction" to the deactivation flow; and has changed the font color of the text consumers had to click to downgrade to light gray to help "stop leakage from recently implemented credit changes (users getting amounts lowered to $50)."

50. Even after Brigit's employees complained that its burdensome cancellation procedure was "making a lot of people angry in the name of retention," and it "doesn't align with [Brigit's] values of simplicity and transparency," Brigit has continued to impose the requirements. Brigit explained in an email to the whole company that "unfortunately" it "had to make changes to prepare for high churn during post-covid time."

51. Brigit acknowledged in an email communication that the difficult cancellation process was part of the company's business strategy. Such communication noted that Brigit had a "pretty clear business argument" for making deactivation "so frictionful," and that they were "making decisions with no time to test" and "throwing the kitchen sink to see what sticks."

52. Many consumers have complained—including to Brigit—that they were confounded by the complexity of Brigit's cancellation process, and were unable to cancel, or had great difficulty cancelling, their accounts. Yet for years Brigit has continued to deter consumers from cancelling their subscriptions.

53. At times, Brigit made changes to this process, but it continued to frustrate consumers' attempts to cancel. In January 2022—in order to avoid having their mobile-app removed from the Apple app store—Brigit began allowing consumers to cancel within the

mobile-app. On or before June 2022, Brigit modified the screens requiring consumers to decline an option to pause twice, respond to a survey, and then decline a free month before they could cancel. In July 2022, after becoming aware of the FTC's investigation, Brigit stopped requiring consumers to decline a free month before they could proceed with cancelling.

**b. Brigit Forces Members with Pending Advances to Continue Paying $9.99 Each Month Until They Repay Their Advance**

54. Brigit makes numerous representations on its website and in other materials that it will not charge consumers late fees, interest, or penalties on cash advances, will not take collection action, and allows consumers to cancel their accounts at any time. Brigit advertises, for example, that there are "[n]o late fees" associated with their cash advances, and that members are entitled to "free repayment extensions." Brigit also represents on its website that consumers can "Get cash – with no interest or late fees" and "With Brigit, you'll never pay interest on your advance, and we won't ding you if you need more time to pay it back." Brigit's website also states there are "[n]o hidden fees… or fine print" associated with membership. Brigit's website represents that Plus members can "[c]ancel anytime," and touts that Members do not "get locked into layers of subscriptions."

55. Contrary to these representations, Brigit prohibits Plus members who have an outstanding cash advance from stopping the recurring monthly fees it charges by cancelling their account or switching to a free membership plan.

56. This means that Plus members are locked into paying $9.99 per month indefinitely until they repay an advance. Some customers reported incurring monthly charges against their will for over a year while they were unable to cancel their account due to an outstanding advance. For a $250 cash advance, this monthly fee is equivalent to a finance

charge of more than 48%, and for a $100 cash advance, it is equivalent to a finance charge of more than 121%.

57. Not only does Brigit's cancellation restriction contradict many of the prominent advertising and marketing claims it makes, but nowhere during the enrollment process, or even in Brigit's terms of service, does Brigit tell consumers they will be required to repay outstanding advances to stop being charged a recurring monthly fee. In fact, Brigit's terms of service describe the cash advances as "non-recourse [a]dvances," and warrant that Brigit "will not engage in any debt collection activities" and "has no legal or contractual claim against you based on a failure to repay an advance." Consumers learn that they are locked into the recurring monthly payments only after they unsuccessfully attempt to cancel their monthly subscription.

58. Based on the facts and violations of law alleged in this Complaint, the FTC has reason to believe that Defendant is violating or is about to violate the FTC Act and ROSCA.

## VIOLATIONS OF THE FTC ACT

59. Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce."

60. Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

61. Acts or practices are unfair under Section 5 of the FTC Act if they cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition. 15 U.S.C. § 45(n).

**Count I**

**Deceptive Claims Regarding Cash Advances**

62. In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of their cash advance services, including through the means described in Paragraphs 8-35, Defendant represents, directly or indirectly, expressly or by implication, that consumers who enroll in Defendant's membership program can get cash advances up to $250.

63. The representations set forth in Paragraph 62 are false and misleading or were not substantiated at the time the representations were made.

64. Therefore, the making of the representations as set forth in Paragraph 62 constitutes a deceptive act or practice in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**Count II**

**Deceptive Claims Regarding the Charge for Instant Cash Advances**

65. In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of their cash advance services, Defendant represents, directly or indirectly, expressly or by implication, that consumers who enroll in Defendant's membership can get cash advances immediately at no extra cost.

66. The representations set forth in Paragraph 65 are false and misleading or were not substantiated at the time the representations were made.

67. Therefore, Defendant's representations as set forth in paragraph 65 constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**Count III**

**Deceptive Claims Regarding Outstanding Advances**

68. In numerous instances, in connection with the advertising, marketing, promotion, offering for sale, or sale of the Brigit Plus membership, Defendant represents, directly or indirectly, expressly or by implication, that consumers can cancel at any time without paying any fees, interest, or other charges on an outstanding advance.

69. The representations set forth in Paragraph 68 are false and misleading or were not substantiated at the time the representations were made.

70. Therefore, Defendant's representations as set forth in paragraph 68 constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

**Count IV**

**Unfairly Charging Consumers Without Consent**

71. In numerous instances, Defendant charges consumers without consent.

72. Defendant's actions cause or are likely to cause substantial injury to consumers that consumers cannot reasonably avoid themselves and that is not outweighed by countervailing benefits to consumers or competition.

73. Therefore, Defendant's acts or practices as set forth in Paragraph 71 constitute unfair acts or practices in violation of Section 5 of the FTC Act, 15 U.S.C. § 45(a), (n).

**<u>VIOLATIONS OF THE RESTORE ONLINE SHOPPERS' CONFIDENCE ACT</u>**

74. In 2010, Congress passed the Restore Online Shoppers' Confidence Act, 15 U.S.C. §§ 8401 *et seq.*, which became effective on December 29, 2010. Congress passed

ROSCA because "[c]onsumer confidence is essential to the growth of online commerce. To continue its development as a marketplace, the Internet must provide consumers with clear, accurate information and give sellers an opportunity to fairly compete with one another for consumers' business." Section 2 of ROSCA, 15 U.S.C. § 8401.

75. Section 4 of ROSCA, 15 U.S.C. § 8403, generally prohibits charging consumers for goods or services sold in transactions effected on the Internet through a negative option feature, as that term is defined in the Commission's Telemarketing Sales Rule ("TSR"), 16 C.F.R. § 310.2(w), unless the seller (1) clearly and conspicuously discloses all material terms of the transaction before obtaining the consumer's billing information, (2) obtains the consumer's express informed consent before making the charge, and (3) provides a simple mechanism to stop recurring charges. 15 U.S.C. § 8403.

76. The TSR defines a negative option feature as a provision in an offer or agreement to sell or provide any goods or services "under which the customer's silence or failure to take an affirmative action to reject goods or services or to cancel the agreement is interpreted by the seller as acceptance of the offer." 16 C.F.R. § 310.2(w).

77. As described in Paragraphs 8 to 58 above, Defendant has advertised and sold its Brigit Plus membership through a negative option feature as defined by the TSR. 16 C.F.R. § 310.2(w).

78. Pursuant to Section 5 of ROSCA, 15 U.S.C. § 8404, a violation of ROSCA is a violation of a rule promulgated under Section 18 of the FTC Act, 15 U.S.C. § 57a.

**Count V**

**Illegal Negative Option Marketing**

79. In numerous instances, in connection with charging consumers for Brigit Plus membership in transactions effected on the Internet through a negative option feature, Defendant failed to:

a) clearly and conspicuously disclose all material terms of the transactions before obtaining the consumers' billing information, including (1) that most consumers cannot obtain cash advances in the amount advertised by the company and many are not able to receive any cash advance at all; (2) that consumers cannot obtain cash advances immediately unless they pay an additional expedited fund fee; and (3) that consumers cannot cancel their membership and stop incurring fees until they have repaid their cash advance in full.

b) obtain consumers' express informed consent before charging the consumers' credit cards, debit cards, bank accounts or other financial accounts for products or services through such transactions including by the conduct described in sub-paragraph (a).

c) provide simple mechanisms for a consumer to stop recurring charges from being placed on the consumer's credit card, debit card, bank account or other financial account.

80. Defendant's acts or practices, as described in Paragraph 79 above, violate Section 4 of ROSCA, 15 U.S.C. § 8403.

## CONSUMER INJURY

81. Consumers are suffering, have suffered, and will continue to suffer substantial injury as a result of Defendant's violations of the FTC Act and ROSCA. Absent injunctive relief by this Court, Defendant is likely to continue to injure consumers and harm the public interest.

## PRAYER FOR RELIEF

Wherefore, the FTC requests that the Court:

A. Enter a permanent injunction to prevent future violations of the FTC Act and ROSCA by Defendant;

B. Award monetary and other relief within the Court's power to grant; and

C. Award any additional relief as the Court determines to be just and proper.

Respectfully submitted,

Dated: November 2, 2023

/s/ James Doty

PATRICK ROY (*pro hac vice* to be filed)
MARK GLASSMAN (*pro hac vice* to be filed)
JAMES DOTY (Bar No. JD1981)
Attorneys
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Mailstop CC-10232
Washington, D.C. 20850
Tel: 202-326-3477 (Roy)
Tel: 202-326-2826 (Glassman)

Tel: 202-326-2628 (Doty)
PRoy@ftc.gov
MGlassman@ftc.gov
JDoty@ftc.gov

Attorneys for Plaintiff
FEDERAL TRADE COMMISSION